[No. 2711.]

## WILL ALLISON *v.* THE STATE.

1. THEFT—ACCOMPLICE—CHARGE OF THE COURT—CASE STATED.—A State's witness having been informed by the defendant of his, defendant's, intention to steal J.'s horse, communicated such information to J. Thereupon J. and the witness entered into an agreement that J. would place his horse at a certain place at a certain time, and that the witness should accompany the defendant to the place at the time agreed upon, ostensibly as his confederate, but in fact to aid J. in the capture of the defendant in the very act of committing the offense. *Held*, that had such agreement been carried out, and the theft occurred at the time and place, and under the circumstances agreed upon, the witness could not be held to have been an accomplice. *Held*, further, that though the agreement was not carried out, and the horse was stolen at another place and at another time, the witness was not an accomplice, and the trial court was not bound to charge the jury upon the law of accomplice's testimony

2. SAME—CONFESSIONS OF UNWARNED PRISONER.—An exception to the
general rule which excludes as inculpatory evidence the confessions of an
unwarned prisoner is when, in connection with that confession, he states
facts which are subsequently found to be true, and which conduce to
establish his guilt. Note in the opinion a state of facts *held*, as pre-
sented, too remote to come within the exception.

APPEAL from the District Court of Hays. Tried below before
the Hon. L. W. Moore.

The indictment charged the appellant with the theft of a
horse, the property of Eli Justice, in Hays county, on the
eleventh day of March, 1883. He was convicted, and awarded
a term of five years in the penitentiary as punishment.

Ed. Massey was the first witness for the State. He testified
as follows: "On the morning of March 11, 1883, the defendant
came to my house, and told me that he was going to steal Eli
Justice's horse. He left my house and went up on the mountain.
Some time after I went into the range, horse hunting. I met
the defendant in the range, and he and I found the horses I was
hunting, and drove them towards my house some distance, when
we separated. On my way home I told the father of Eli Justice
that the defendant was going to steal Eli's horse that night. I
then went home, and after night I went over to Eli Justice's and
told him of the defendant's intention to steal his horse. After a
little while I went down below and to the left of Eli Justice's
house, and found the defendant. He told me that it was then
too light, but that he would get the horse between midnight and
day, and take him to Boston's. I then returned to the house
and told the Justices of the defendant's whereabouts and what
he had stated to me. I then went home."

Cross-examined, the witness testified as follows: "The de-
fendant was riding a dun mare when he came to my house. I
have her in my possession now, and have had her ever since the
defendant left. I had her prior to the time I got the attachment
from the sheriff of Travis county. Justice said he would have
his horse at a certain place on a hill that night, and I went there,
but the horse was not put there. I did not see the defendant
any more after I saw him below Justice's lot, until after he was
arrested. I did not trade the defendant Justice's horse for the
dun mare he rode to my house. I am holding the mare left by
the defendant near Justice's house at the request of the sheriff
of Travis county. I found this mare about a quarter of a mile

from my house the next morning after Justice's horse was stolen."

James Justice was the second witness, and was introduced by the State. He testified, in substance, that about two hours before day on the morning of March 11, 1883, he was notified that his brother Eli's horse was stolen. Witness went immediately to Mr. Ed. Massey's house, and Mr. Massey told him that the defendant would take the horse to Boston's, near Oatmanville, in Travis county. He immediately went in pursuit, and when he had reached a point about five miles from home, it being then daybreak, he discovered a horse track in the road, which he recognized as that of the stolen horse from the fact the front feet were shod with corked shoes and the hind feet with smooth shoes. The witness followed this track on the road to a point within eight miles from Oatmanville, where it turned off the Oatmanville road and went in the direction of the point where the defendant lived. Witness arrested the defendant at Boston's, about four miles from Oatmanville, and took him to a Mr. Pace's, some four miles from Boston's.

Here the State, over the objection of the defendant, read in evidence the following instrument in writing:

"*Mr. Boston:* You will deliver the horse to the bearers of this note. He is their property.

"W. E. Allison.

"Witnesses:

"W. M. Robertson

"W. W. Pace."

The witness stated that this instrument was written by Mr. Pace in the presence of, and by request of, the defendant, who said that he could not write. He requested Pace to sign his name, and Pace did so. It was read to the defendant and then delivered to the witness, who took it to Boston. Witness did not find the horse at Boston's. Boston said that he knew nothing of the horse, and had never seen it, but would go, and he did go, with the witness to see if the horse could be found staked anywhere about his premises. Nothing could be found of the horse. Boston then asked the witness if the horse would go home in the event he had broken his rope or pulled up the stake pin, and the witness replying that he thought he would, the search was abandoned and the witness started home.

On his way home, at a point about five miles from Oatman-ville towards home, the witness found the horse's track and followed it home, where upon his arrival he found the horse. It is about twenty-five miles from where the horse was stolen in Hays county to Mr. Boston's house, where the defendant was arrested. Witness first went to the defendant's house, and not finding him there, went to Boston's. This was on Monday after the Sunday night of the theft, and was about three o'clock p. m.

Will Justice testified, for the State, as follows: "I know the defendant. I saw him at Ed. Massey's on the eleventh day of this month (March, 1883). Brooks's boy and myself got in the crib to watch the horse. We did not see my brother's horse when he was taken. We heard him go over the fence, and we went to the house, got a light, and examined where the horse went out of the lot. We found his tracks where the fence was let down. The next morning I assisted in trailing the horse by his tracks for a distance of about five miles. We saw a man's track from where the fence was let down to about fifty yards below the lot, where, judging from appearances, the horse was sad-dled and ridden away. The horse was tied to the crib in the lot when he was taken. Brooks and witness were in the crib on the watch, and went out when they heard a noise and found the horse gone. The rope with which the horse was tied was still attached to the crib. Neither witness nor Brooks gave any one permission to take the horse."

The main question raised on motion for new trial was that upon which the judgment of conviction is reversed.

*E. R. Kone* and *O. T. Brown,* for the appellant: 1. The court erred in failing to charge the jury concerning the law upon the subject of the testimony of an accomplice demanded by the tes-timony of the witness Massey. (Code Crim. Proc., Art. 741; 12 Texas Ct. App., 105).

2. The court erred in admitting the testimony of the witness. James Justice, about language used by appellant while in the custody of an officer, purporting to disclose facts or circum-stances such as would lead to finding the alleged stolen property, because, first, it had not been previously shown that such lan-guage used by appellant had, in fact, led to the discovery of the property when and where indicated; and, second, it was not. shown, either before or after, that such language had led to the finding of the property at all.

3. Having allowed such to go to the jury over the objection of the appellant, the court erred in failing afterwards to withdraw it from their attention, because it was not shown that it had conduced to the finding of the property. (Code Crim. Proc., Art. 750; 11 Texas Ct. App., 356, and authorities there cited).

4. The court erred in permitting to go to the jury, over the objection of the appellant, that certain written instrument set out in the statement of facts; first, because, as appears from the testimony of the witness James Justice, it was neither written nor signed by appellant; second, because, if written or signed by some third party at the request of appellant, such third party should himself have been called to testify with regard to it, but was not; third, because if so written, appellant was himself, at the time of such request and writing, in the custody of an officer; fourth, because the man Boston disavowing any knowledge of the horse or its whereabouts, the document in question did not conduce to the finding of the property. (Code Crim. Proc., Art. 750; 11 Texas Ct. App., 356, and authorities there cited).

5. Neither the language referred to in the third foregoing proposition, nor the document referred to in the fourth proposition, having conduced in any manner or degree to the discovery of the property, the court erred in failing to withdraw them from the consideration of the jury.

First, because they in no wise connected appellant with the commission of the offense charged. Second, because, being allowed by the charge to remain with the jury in their deliberations, they may have been, and probably were, led to regard them as confessions of the appellant.

*J. H. Burts*, Assistant Attorney General, for the State.

White, Presiding Judge. From the evidence before us it does not appear that the witness Massey was an accomplice. He had been informed by defendant of his (defendant's) intention to steal Justice's horse, and he immediately told Justice's sons, and Justice himself subsequently, of defendant's intention. It is true that Justice and Massey then arranged that Justice should have his horse at a certain place, doubtless with a view that they might capture defendant in the very act of committing the theft, and it is inferable that there was a further understanding between the parties that Massey was to accompany the de-

fendant to the place and at the time when the theft was to be committed, ostensibly as his confederate, but in fact that he might aid in his arrest after the crime was consummated. Had this agreement been carried out, and the horse stolen at the time, place and under these circumstances mentioned, Massey, in law, would not have been an accomplice in the theft. (*Pigg* v. *The State*, 43 Texas, 108; *Johnson* v. *The State*, 3 Texas Ct. App., 590.)

But this agreement was not carried out, and the horse was stolen on another occasion and in a different place. Instead of being an accomplice, it appears to us from the evidence that Massey acted throughout the part of a law abiding citizen who, knowing that a crime was about to be committed, did, or was willing to do, all in his power to prevent it or bring its perpetrator to punishment. There was no occasion for the court to charge the law with regard to accomplice testimony in this case.

Exceptions were saved to certain portions of the evidence admitted over objections of defendant. It appears that after defendant's arrest at the house of one Boston, he was taken some four miles to the house of one Pace. Whilst there Pace, at request of defendant, wrote an order to Boston to deliver the horse to the bearer, which order was also signed at his request for defendant by Pace, and then was handed to the witness, who went back with it to Boston's to get the horse. He did not find the horse at Boston's, but says that about five miles from Oatmanville, on his road home, "I was attracted by a horse track that I recognized as the track of the horse I was hunting, and followed it home. When I reached home the horse was there."

Inasmuch as defendant was in custody when the order was written, it is insisted that it was inadmissible in evidence as an admission or confession by the defendant, under Article 750, Code Criminal Procedure, because it did not state facts or circumstances found to be true which conduced to establish his guilt, and that the horse was not found at Boston's. By previous decisions construing this statute, it seems that the right to use such admissions and confessions is not limited to such cases only where it is shown that the property was actually found at the place indicated in the confession, but they are admissible also whenever they furnish information by which the property is recovered, or when the property has been traced by means of the information received from the prisoner. (*Selvidge* v. *The State*,

30 Texas, 59; *Strait* v. *The State,* 43 Texas, 486; *Warren* v. *The State,* 29 Texas, 370; *Zumwalt* v. *The State,* 5 Texas Ct. App., 521; *Berry* v. *The State,* 4 Texas Ct. App., 492; *Davis* v. *The State,* 8 Texas Ct. App., 510; *Kennon* v. *The State,* 11 Texas Ct. App., 356.

Did the information conveyed in the order lead to the recovery of the horse, or was it the means by which the horse was traced and finally recovered? On account of the information the witness went to Boston's to get the horse. He did not find it there, nor did he there discover any evidences by which he was enabled to trace the horse. From there he started home, and about "five miles from Oatmanville" he finds a track which he recognizes as his horse's track, and which he traced or followed home, where he found the horse. In another portion of his testimony he says: "Boston's is about four miles from Oatmanville." Now, was Boston's between his house and Oatmanville and four miles nearer than the latter place? or was it four miles beyond Oatmanville, going from his house? If it was nearer by four miles than Oatmanville, then the track which he found, being five miles from Oatmanville, must have been within one mile of Boston's. If, however, Oatmanville was nearer by five miles than Boston's, and the track was found four miles from Oatmanville on his road home, then the track was discovered for the first time by witness some nine miles from Boston's, where he was told by defendant's order that the horse was to be found. If the track was found within a mile of the place where defendant's information led him to expect to find the horse, and by means of the track there found he was enabled to trace the horse until he was recovered, we might be inclined to hold that the evidence which brought about these proximate results was admissible under the rule of the statute. But if the track was for the first time discovered nine miles from Boston's, the distance would be entirely too remote to admit the conclusion that the track was discovered and the party enabled to trace the horse by means of the information derived from the order given by defendant.

As found in the record, the statement of facts leaves this important question just in this unsatisfactory condition. Feeling convinced that these matters are susceptible of better proof than we have before us, and believing that such evidence is necessary to the admissibility of the order, and that it perhaps

may be adduced on another trial, the judgment is reversed and the cause is remanded.

*Reversed and remanded.*

Opinion delivered April 28, 1883.